IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 08-374 |
| | ) | |
| ALONZO LAMAR JOHNSON, | ) | |
| JEROME LAMONT KELLY, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

CONTI, District Judge.

Defendants Alonzo Lamar Johnson ("Mr. Johnson") and Jerome Lamont Kelly ("Mr. Kelly") (collectively, "defendants") each filed a motion to suppress wiretap evidence (respectively, ECF Nos. 597 and 667), alleging that the wiretap evidence the government gathered against them should be suppressed because the interceptions were not properly authorized under the applicable law – Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-20. Specifically, defendants argued that the February 7, 2008 order authorizing wiretap interceptions (one of multiple interceptions authorized in connection with the instant matter) was illegal because the original signature of the authorizing judge ("Authorizing Judge") is missing, making the order authorizing the interception insufficient on its face. 18 U.S.C. § 2518(10)(a)(ii). On April 3, 2012, after considering the parties' submissions, the evidence adduced during the hearings held on the motions and the arguments of counsel, the court concluded for the reasons set forth on the record that the motions should be

denied. This is the written opinion that the court advised it would issue to explain in more detail the reasons for its decision.

**<u>Background</u>**

Defendants were indicted for conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and fifty grams or more of crack cocaine in violation of 21 U.S.C. § 846. Evidence against defendants included telephone interceptions obtained under the authority of court orders.

The original wiretap application was presented to the Authorizing Judge on January 8, 2008, and docketed at Miscellaneous No. 08-07. Subsequently, the government presented nine additional wiretap applications or applications for extensions during the course of the investigation, each of which included an affidavit by FBI Special Agent Daniel Booker ("Booker")[1] or FBI Special Agent Michael Peetz.[2] These applications were docketed at Miscellaneous Numbers 08-07(a) through 08-07(i) inclusive.

Defendants each filed a motion to suppress the wiretap evidence. Mr. Johnson argued that "[n]ine telephone conversations, purporting to be those of Defendant Johnson, were allegedly intercepted between May 6, 2008 and May 21, 2008." ECF No. 597 at 4. These interceptions were made under the authority of orders entered on April 14, 2008 and May 14, 2008 by the Authorizing Judge at Miscellaneous Numbers 08-07(d) and 08-07(e). Mr. Johnson did not dispute the legality of the orders entered at Miscellaneous Numbers 08-07(d) and 08-07(e). Instead, Mr. Johnson argued that those orders and their accompanying applications were tainted by improprieties involved with the issuance of the authorization order at Miscellaneous

---

[1] Booker was the affiant with respect to the applications dated January 8, 2008, February 7, 2008, March 7, 2008, April 7, 2008, April 14, 2008, May 14, 2008, June 3, 2008 and June 20, 2008. Miscellaneous Nos. 08-07 – 08-07(g).

[2] FBI Special Agent Peetz was the affiant with respect to the applications dated July 15, 2008 and August 21, 2008. Miscellaneous Nos. 08-07(h)-(i).

2

Number 08-07(a), entered on February 7, 2008. Mr. Johnson, in essence, argued that the order entered in connection with the application docketed at Miscellaneous Number 08-07(a) was not valid because the order authorizing the interceptions bears a rubber-stamped signature of the Authorizing Judge, as opposed to the judge's actual inked or penned signature. As such, Mr. Johnson argued that order fails to comply with 18 U.S.C. § 2518(10)(a)(iii) and all the conversations intercepted between February 7, 2008 through the end of the investigation (September 20, 2008) should be suppressed.

Mr. Kelly made similar claims in his motion to suppress. ECF No. 667. Specifically, Mr. Kelly argued that the February 7, 2008 order authorizing the interceptions filed at Miscellaneous Number 08-07(a) failed to comply with the applicable statutory requirements. Mr. Kelly argued all interceptions obtained under its authority, as well as all subsequent interceptions are not valid.[3]

At the conclusion of the December 21, 2011 hearing, the court ordered defendants to file briefs addressing whether defendants may challenge an affidavit for a wiretap that predates the application for the wiretaps on which they were intercepted, including such issues as the applicability of the fruit of the poisonous tree doctrine. Each defendant filed a brief (ECF No. 729, Mr. Kelly, and ECF No. 735, Mr. Johnson). On March 15, 2008, the government filed its response (ECF No. 758). Two additional hearings were held on this matter (March 15, 2012 and April 3, 2012). At the conclusion of the hearing on April 3, 2012, the court denied the motions and advised it would issue an opinion to further explain the court's reasons.

## **Standard of Review**

(a) <u>Standing</u>

---

[3] Neither the government nor Mr. Kelly identified the date or dates of the orders authorizing the wiretaps during which his conversations were intercepted.

With respect to standing the Court of Appeals for the District of Columbia Circuit in United States v. Williams, 580 F.2d 578 (D.C. Cir.), cert. denied by Lincoln v. United States, 439 U.S. 832 (1978), noted:

> Before an accused may be heard to complain that prosecution evidence should be suppressed because it was come by illegitimately, he must first make out his standing, which generally entails a demonstration that his own interests were affected by the challenged search or seizure. With particular regard to electronic eavesdropping, the accused must show that it was directed at *him*, that the Government intercepted *his* conversations or that the wiretapped communications occurred at least partly on *his* premises. <u>Unless he can establish one of these events, it is legally irrelevant that the surveillance was unlawful. And this rule remains true even if acquisition of the questioned evidence was not the direct result of unlawful conduct but instead was the fruit of the proverbial poisonous tree.</u>[4] Thus, <u>it was incumbent upon each appellant seeking to contend that the earlier unlawful wiretaps tainted the later ones at Seventh Street and Landover and the evidence therefrom to show that the prior misconduct made possible an interception of his conversations or a breach of the privacy of his premises</u>.

Id. at 583 (footnote omitted) (emphasis in underline added).

In Williams, the Court of Appeals for the District of Columbia observed:

> It is clear, however, that to facilitate an accused's effort to demonstrate that evidence employable against him is contaminated by illegal surveillance previously conducted, the Government, upon request, must "affirm or deny the occurrence of the alleged unlawful act." And where, as here, it is unquestioned that there has been electronic eavesdropping and that it was unlawful, the pertinent response is one indicating whether the accused himself was victimized thereby. If the Government answers in the affirmative, the accused is entitled to examine the records incorporating the contents of any monitored conversation that he has standing to attack.

Id. at 583-84 (footnotes omitted).

---

[4] As the district court noted in United States v. Ramos-Gonzales, No. 07-cr-318, 2010 U.S. Dist. LEXIS 113971 (D. P.R. Oct. 25, 2010):

> [C]aselaw has established that the definition of an aggrieved person is to be construed in accordance with the rules of standing and may be not be vicariously asserted. [*Alderman v. United States*, 394 U.S. 165 (1969)]. In other words, the person challenging the legality of the evidence must establish "that he himself was the victim of an invasion of privacy." *Id.* at 174. Thus, Title III standing is almost identical to the standing requirements of the Fourth Amendment. *United States v. Gallo*, 863 F.2d 185, 192 (2d Cir. 1988).

Id. at *9.

(b) <u>Validity of Wiretap Order</u>

With respect to determining the validity of a wiretap order, the court first must determine whether the wiretap order is facially defective and if so, second, must determine whether the omissions which made the order facially defective are technical defects not requiring suppression. <u>United States v. Traitz</u>, 871 F.2d 368 (3d Cir. 1989).

## **Discussion**

The government argued: (1) defendants lack standing and (2) the February 7, 2008 order is valid. Defendants asserted they have standing and the order is invalid. Each argument will be addressed below.

**(1) Standing**

Preliminarily, the court must address the question of standing raised by the government. The government argued that defendants do not have standing to challenge the legality of the February 7, 2008 application and order because they were not "aggrieved" persons with respect to that application and order. Upon review, the court agrees with the government's argument that neither defendant is an "aggrieved person" for purposes of the statute.[5]

With respect to the burden a defendant bears in challenging the legality of the government's monitoring of communications, the Court of Appeals for the Third Circuit noted:

> [18 U.S.C. § 3504] provides that if any party claims that evidence is inadmissible because it was the product of an unlawful act, including unlawful use of a wiretap, the opponent of the claim must confirm or deny the occurrence of the unlawful act. <u>Congress passed § 3504 out of recognition that it can be difficult for defendants to prove that they have standing to challenge evidence discovered due to previous, unlawful electronic surveillance.</u> *See United States v. Williams,* 580 F.2d 578, 583 (D.C. Cir. 1978). <u>Pursuant to § 3504, if defendants claim that evidence against them was acquired as a result of prior, unlawful surveillance, the</u>

---

[5] Aggrieved person "means a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11).

<u>Government must confirm or deny whether that unlawful surveillance occurred.</u>
*Id.*

United States v. Heilman, 377 F. App'x 157, 184 (3d Cir. 2010) (emphasis added).

The government cites United States v. Apple, 915 F.2d 899 (4th Cir. 1990), for the proposition that defendants must first demonstrate that their interests were affected by the February 7, 2008 order before the government's obligation to affirm or deny is triggered. To this end, the court of appeals in Apple held:

> [A] party claiming to be the victim of illegal electronic surveillance must first demonstrate that his interests were affected before the government's obligation to affirm or deny is triggered. This "standing" requirement, *see* H.Rep. No. 1549, 91st Cong., 2d Sess., ——, *reprinted in* 1970 U.S.Code Cong. & Admin.News 4007, 4027, is met if a definite "claim" is made by an "aggrieved party." A cognizable "claim" need be no more than a "mere assertion," provided that it is a positive statement that illegal surveillance has taken place. *See United States v. Tucker,* 526 F.2d 279, 282 & n. 4 (5th Cir. 1976). But the claimant must also make a prima facie showing that he was "aggrieved" by the surveillance; that is, that he was a party to an intercepted communication, that the government's efforts were directed at him, or that the intercepted communications took place on his premises. This critical showing may not be based on mere suspicion; it must have at least a "colorable basis." *See United States v. Pacella,* 622 F.2d 640, 643 (2d Cir. 1980).

Id. at 905.

The court declines to follow Apple as it appears inconsistent with Heilman and Williams, the decision relied upon by the Court of Appeals for the Third Circuit in Heilman. The government under Williams must first affirm or deny that illegal surveillance occurred.

Here, that distinction is not relevant because the government clearly stated that no unlawful surveillance occurred and defendants were not intercepted in connection with the February 7, 2008 application and order. ECF No. 839 at 101. Defendants acknowledged that they were not intercepted in connection with the February 7, 2008 order, but disputed that the February 7, 2008 order authorizing the wiretap was validly signed and argued the surveillance

6

pursuant to that order was unlawful. Under Williams, defendants can only challenge the later wiretaps in which they were intercepted if they demonstrate that the February 7, 2008 order was unlawful and that the evidence obtained from the wiretap authorized by that order made possible "the interceptions of [their] conversations . . . ." Williams, 580 F. 2d at 583.[6]

Mr. Johnson argued that he has standing to challenge the legality of the interception based upon a letter his previous counsel received from Assistant United States Attorney Soo Song ("Ms. Song") dated November 9, 2009, in which Ms. Song provided Mr. Johnson's counsel with transcripts of telephone calls between Mr. Johnson and Mr. Anthony Hoots ("Mr. Hoots"), who was the target of the investigation. Def. Ex A. Mr. Hoots – but not Mr. Johnson – was intercepted on telephone calls under the authority of the February 7, 2008 order. Mr. Johnson was intercepted on telephone calls under the authority of subsequent wiretap authorizations – interceptions authorized by orders dated April 14, 2008 and May 14, 2008. Mr. Johnson, other than noting Mr. Hoots was intercepted during the surveillance conducted pursuant to the authority of the February 7, 2008 order, did not identify any evidence from conversations

---

[6] See United States v. Wright, 524 F.2d 1100 (2d Cir. 1975). In Wright, the Court of Appeals for the Second Circuit held:
> More importantly, we fail to see how appellant has standing to assert the illegality of the April taps. In order to challenge wiretap-derived evidence, one must be an "aggrieved person", *i.e.*, one who was a party to an intercepted wire or oral communication or against whom the interception was directed. 18 U.S.C. §§ 2510, 2518. Since appellant was not a party to any intercepted April communications, none of which occurred on his premises, he is not aggrieved. *In re Dellinger*, 461 F.2d 389, 392 (7th Cir. 1972); *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).
>
> We therefore conclude that since appellant could not have challenged the April wiretaps directly by suppressing information derived therefrom, he cannot challenge them indirectly by suppressing evidence from the subsequent taps and a search warrant which was secured in part through the same information. [*United States v. Gibson,* 500 F.2d 854, 855 (4th Cir. 1974)]; *United States v. Scasino*, 513 F.2d 47 (5th Cir. 1975); *United States v. Lanese*, 385 F. Supp. 525 (N.D. Ohio 1974).

Id. at 1102.

intercepted under the February 7, 2008 order that made possible the later interceptions of Mr. Johnson's conversations.

Counsel for Mr. Kelly represented that she did not receive a formal letter from the United States Attorney's Office. Counsel, however, stated that she received one document from Mr. Michael Ivory, Assistant United States Attorney, and one from Ms. Song, dated, respectively, June 30, 2008 and July 1, 2008, which, in her recollection, were the transcripts of telephone calls involving Mr. Kelly. ECF No. 839 at 104-05. The telephone calls were not intercepted under the authority of the February 7, 2008 order, but "pursuant to a subsequent affidavit." ECF No. 729 at 4. There was no evidence adduced linking the interceptions of Mr. Kelly on telephone calls to evidence obtained from the interceptions authorized under the February 7, 2008 order.

In light of the foregoing, the court concludes that because defendants did not demonstrate the interceptions authorized by the February 8, 2008 order made possible the later interceptions of defendants' telephone calls, they failed to prove they had standing to challenge the February 7, 2008 order.

**(2) Validity of February 7, 2008 order**

Even if the court were to find that defendants had standing to challenge the February 7, 2008 order, the court concludes that, in light of the testimony received, the absence of the Authorizing Judge's original signature on the order is a mere technical defect which does not warrant the suppression of the wiretap evidence.

The thrust of defendants' argument is that the wiretap evidence obtained under the authority of the orders dated April 14, 2008 and May 14, 2008 and any order under which the interceptions of Mr. Kelly's conversations were authorized should be suppressed because the February 7, 2008 wiretap application and order approving that application do not comply with 18

U.S.C. § 2518. Specifically, defendants argued that the February 7, 2008 application and order are not valid because the original signature of the Authorizing Judge is missing and that a rubber-stamped signature is not equivalent to an actual signature.

In Traitz, the Court of Appeals for the Third Circuit considered a wiretap order that failed to identify the investigating agency and the Department of Justice official who authorized the application. Applying a "two-tiered analysis,"[7] the court first determined that the order was facially defective. It then affirmed the denial of a suppression motion because "these omissions are properly viewed as technical defects not warranting suppression." Traitz, 871 F.2d at 379.

In United States v. Moore, 41 F.3d 370 (8th Cir. 1994), the Court of Appeals for the Eight Circuit applied the Traitz two-tiered analysis in a case similar to the matter at issue. It concluded that the district court erred in suppressing the wiretap evidence on the basis that the order authorizing the interception was not signed by the judge. The court of appeals held:

> [18 U.S.C. §§ 2510–20] broadly prohibits wiretaps "[e]xcept as otherwise specifically provided in this chapter." § 2511(1). It mandates detailed procedures that law enforcement officials must follow in applying for a wiretap order, *see* §§ 2516, 2518(1), and specific findings that a judge must make in issuing a wiretap order, *see* § 2518(3). It also specifies in detail the substantive provisions of the wiretap approval order, *see* § 2518(4), and it limits the duration of the order and any extension order, *see* § 2518(5). Finally, the statute prohibits the use of wiretap evidence in any trial "if the disclosure of that information would be in violation of this chapter." § 2515. Section 2518(10)(a) defines the disclosures prohibited by § 2515 and the standards for suppressing wiretap evidence. *See* [*U.S. v. Giordano*, 505, 524 (1974)]. This case turns on whether suppression is required under § 2518(10)(a)(ii) because the February 19 wiretap order was "insufficient on its face."
>
> . . . .
>
> [E]very circuit to consider the question has held that § 2518(10)(a)(ii) does not require suppression if the facial insufficiency of the wiretap order is no more than

---

[7] "First, this Court must determine if the Order was facially deficient. If we find that the Order was defective in some manner, we must examine the defect to determine if it is merely a technical defect which would not require suppression of the evidence obtained from the electronic surveillance. *United States v. Acon,* 513 F.2d 513, 517 (3d Cir. 1975)." Traitz, 871 F.2d at 379.

9

a technical defect. *See United States v. Traitz,* 871 F.2d 368, 379 (3d Cir.), *cert. denied,* 493 U.S. 821, 110 S.Ct. 78, 107 L.Ed.2d 44 (1989); *United States v. Swann,* 526 F.2d 147, 149 (9th Cir.1975) (denying suppression for a "minor facial insufficiency"); *United States v. Joseph,* 519 F.2d 1068, 1070 (5th Cir.1975), *cert. denied,* 424 U.S. 909, 96 S.Ct. 1103, 47 L.Ed.2d 312 (1976) ("this particular defect did not make an order facially insufficient"); *United States v. Vigi,* 515 F.2d 290, 293 (6th Cir.), *cert. denied,* 423 U.S. 912, 96 S.Ct. 215, 46 L.Ed.2d 140 (1975) (denying suppression for "minor facial insufficiency"); *United States v. Acon,* 513 F.2d 513, 517–19 (3d Cir.1975) (same). *See also* a pre- *Giordano* decision, *United States v. Cirillo,* 499 F.2d 872, 880 (2d Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974) (denying suppression because "omission of a minimization directive was a 'technical defect' ").

. . . .

Although many court orders are oral, and some written orders may be intentionally unsigned, Judge Cheuvront testified that he intended to sign the February 19 order, and Officer Snoad testified that he would not have executed the order had he known it was unsigned. Thus, we accept the district court's conclusion that the order is "insufficient on its face" and turn to the second part of the *Traitz* two-tiered analysis, whether that defect requires suppression of the resulting wiretap evidence.

The requirement of judicial approval is obviously at the core of the congressional purposes underlying this statute. In addition, although § 2518(3) only says that the judge "may enter" an order, the requirement that judicial approval be expressed in a detailed order, § 2518(4), necessarily requires that the order be in writing. However, § 2518(4) does not mandate a signed order. Perhaps that is because Congress assumed that any written judicial order would be signed. But more likely it reflects congressional deference to the judiciary to decide how an order may be "entered," and perhaps it also reflects recognition that modern technology offers ways to replace the personal signature. *See United States v. Turner,* 558 F.2d 46 (2d Cir.1977) (upholding search warrant issued by telephone).

Because the statute does not expressly require a signed order, our inquiry must focus on whether the absence of Judge Cheuvront's signature in this case violated a core statutory requirement, or was a mere technical defect. The record reveals compliance with all the fundamental statutory safeguards that protect against unauthorized or unwarranted wiretap surveillance. The application was authorized by the Nebraska Attorney General, as required by § 2516(2). The two-hundred-page application met the requirements of § 2518(1). Judge Cheuvront made the findings required by § 2518(3) before deciding to approve the application. The unsigned order, which Judge Cheuvront intended to sign, contained each of the specific provisions mandated by § 2518(4), and complied with the thirty-day time limit of § 2518(5). In short, unlike the situation in *Donovan,* the absence of Judge Cheuvront's signature on the February 19 order does not reflect a violation of *any*

> underlying statutory requirement. On the facts of this case, the unsigned order was a technical defect, like the missing page three in the wiretap order in *Traitz. See* 871 F.2d at 376–78; *see also United States v. Vogt,* 760 F.2d 206, 208 (8th Cir.1985) (approving telephonic authorization to apply for a wiretap). We disagree with the unsupported assertion in *United States v. Ceraso,* 355 F. Supp. 126, 128 (M.D. Pa. 1973), that, regardless of the underlying facts, an unsigned order can never be effective.
>
> Noting minor inconsistencies in the recollections of Judge Cheuvront and Officer Snoad, the district court concluded that a per se rule of facial insufficiency was necessary to avoid the need to determine what another judge intended. We disagree. It does not require particularly difficult or sensitive fact-finding to determine (i) whether Judge Cheuvront intended to "enter" the February 19 order, as § 2518(3) requires, and (ii) whether Officer Snoad believed he was acting under judicial authorization when he thereafter directed installation of the wiretap. *See United States v. Smith,* 726 F.2d 852, 859 (1st Cir.) (en banc), *cert. denied,* 469 U.S. 841, 105 S.Ct. 143, 83 L.Ed.2d 82 (1984) (stating in a wiretap case that "absence of a compelling signature on a critical document can be remedied by proof of actual authority"). Moreover, in this case, there is no disquieting issue of judicial credibility to be resolved. On March 19 and March 26, 1993, long before the defect in the February 19 order was discovered, Judge Cheuvront signed and filed written orders reciting that the February 19 unsigned order was a "prior authorization" and an "order of this Court."
>
> For the foregoing reasons, we reject the district court's conclusion that this suppression issue should be resolved on the basis of form, not substance. To the extent that the unsigned February 19 order is "insufficient on its face," the insufficiency is a technical defect not requiring suppression under § 2518(10)(a) as construed by the Supreme Court.

Id. at 374-76 (footnote omitted).

Here, the absence of the Authorizing Judge's actual signature on the order is somewhat similar to the unsigned order in Moore. One could therefore conclude that the order with a rubber-stamped signature of the Authorizing Judge is insufficient on its face. This conclusion, however, would not end the analysis as the court must turn to the second part of the Traitz two-tiered analysis and determine whether that defect requires suppression of the resulting wiretap evidence. Because the statute does not expressly require a signed order, the inquiry must focus

11

on whether the absence of the Authorizing Judge's original signature in this case violated a core statutory requirement or was a mere technical defect.

Like in <u>Moore</u>, the February 7, 2008 application and order meet the fundamental statutory safeguards and the only issue is whether or not the rubber-stamped signature is a technical defect. During the hearing held on December 21, 2011, Agent Booker testified that he recalled being sworn by the Authorizing Judge and signing the affidavit accompanying the wiretap application dated February 7, 2008 in the presence of the Authorizing Judge. ECF No. 715 at 26.[8] Although several wiretap applications were prepared during the investigation of the instant matter, Agent Booker recalled that the affidavit prepared in connection with the February 7, 2008 wiretap application was noteworthy because it referred to a homicide and he "remember[ed] [the Authorizing Judge] commenting on the homicide and the violent nature of the group that [the FBI] was investigating." <u>Id.</u> at 27. Agent Booker testified: a) he had that conversation with the Authorizing Judge in her office at the time the February 7, 2008 wiretap application was presented to her, b) the Authorizing Judge sworn him in to the facts contained in the affidavit, c) the Authorizing Judge authorized the interception, and d) the Authorizing Judge signed one of the affidavits or one of the documents accompanying the wiretap application. <u>Id.</u> at 27-29, 33, 38, 42, 44, 54, 57, 59-60. Agent Booker testified that normally three copies of each wiretap application and order would be presented to the Authorizing Judge and that both the copy of the February 7, 2008 wiretap order in possession of the FBI, as well as the copy submitted with the Clerk of Court, bears a stamp of the Authorizing Judge's signature, as opposed to her actual signature. <u>Id.</u> at 29, 33, 50-51.

---

[8] Each wiretap application generally attached an affidavit from the agent conducting the investigation, a proposed order for the judge to authorize the wiretap, and one or more proposed orders directed to the telephone company or other service provider involved in the investigation. ECF No. 715 at 42-43.

12

During the hearing held on March 15, 2012, Ms. Song and Mr. Jack Hamilton, the Authorizing Judge's courtroom deputy ("Mr. Hamilton), testified about the events surrounding the application for a wiretap authorization on February 7, 2008. Ms. Song testified that she recalled preparing three separate sets of the February 7, 2008 wiretap application (which included the affidavit, an order authorizing the interception and the service provider orders) and that she forwarded to the Authorizing Judge a copy of at least the affidavit well in advance of the meeting with her. ECF No. 839 at 16-17, 40-42. On February 7, 2008, Ms. Song brought the three sets of the February 7, 2008 application, along with the accompanying affidavit and orders, with her to the meeting with the Authorizing Judge. Id. at 17, 36-8, 41-42. Agent Booker was also present at the meeting. Id. at 18, 40. While in the Authorizing Judge's office, the Authorizing Judge and Agent Booker engaged in a substantive discussion about a homicide that was referred to in the February 7, 2008 application. Id. The Authorizing Judge sworn in Agent Booker and Agent Booker signed the affidavit in the presence of the Authorizing Judge and Ms. Song. Id. at 19, 53-54. Similarly, the Authorizing Judge sworn in Ms. Song and Ms. Song signed the application. Id. Ms. Song recalled that the Authorizing Judge signed at least one set of the documents. Id. at 20, 41, 57.

Ms. Song testified that normally the Authorizing Judge would sign one set and that the additional copies would be conformed to the original by affixing her stamped signature. Id. at 20-21, 45-6. This stamped signature would be affixed by Mr. Hamilton, who at that time was the Authorizing Judge's courtroom deputy. Id. at 21, 61.

After the Authorizing Judge signed at least one set of the wiretap application and authorizing order and Mr. Hamilton affixed her stamped signature to one set, one set would be taken to be filed in the clerk's office, Ms. Song would keep one set, and the FBI would keep the

last set. Id. at 14, 47. Ms. Song could not recall how the February 7, 2008 set was taken to the clerk's office. Id. at 21, 47. Of the copies of the February 7, 2008 set that could be located, all copies bear the rubber-stamped signature of the Authorizing Judge, but the original inked signature of that judge is nowhere to be found. Id. at 22. Ms. Song also did not know what happened to the copy provided to the Authorizing Judge in advance of the meeting. Id. at 23.

Ms. Song recognized her handwriting at the bottom of page 11 of the February 7, 2008 wiretap application. Id. at 23-24. Specifically, she testified that she wrote the words "February 7", the time ("12:26") and her signature. Id. at 24, 57, 72-3. In support of Ms. Song's testimony, the government introduced into evidence a redacted page of Ms. Song's personal calendar from February 7, 2008. The page shows two hand-written notations, one that states "T3 signed" and one that states "30 days". Id. at 25. The notations made on February 7, 2008, meant that a Title III application was presented to the Authorizing Judge on that day, the Authorizing Judge signed the order on that day, and the authorization would expire in thirty days. Id. at 26. The government also offered into evidence a progress report related to the wiretap application at issue here dated February 19, 2008. Id. at 27. In the progress report, signed by Ms. Song and addressed to the Authorizing Judge, Ms. Song "affirm[ed] the fact that [the Authorizing Judge] had entered an order authorizing the interception" on February 7, 2008. Id. at 28. Subsequent progress reports also stated that the Authorizing Judge had authorized an interception on February 7, 2008. Id. at 28-30.

Mr. Hamilton, the Authorizing Judge's courtroom deputy at the relevant time, testified that he recalled the events surrounding the execution of the February 7, 2008 wiretap application and order. Specifically, he recalled talking about this matter with the Authorizing Judge after Ms. Song and Agent Booker left the chambers. Id. at 75-6, 80. Mr. Hamilton stated that he kept

the Authorizing Judge's rubber stamp of her signature in a drawer of his desk and that he never used that stamp without the Authorizing Judge's permission. Id. at 71-72, 78-79, 88. Mr. Hamilton recognized his handwriting on the last page of Agent Booker's affidavit, the order authorizing the interception, and the service provider orders presented to the Authorizing Judge. Id. at 73-75. Specifically, he testified that he wrote the word "7th" on the affidavit, and the words "7th" and "February" on the order authorizing the interception and the two service provider orders. Id. at 74-5. Mr. Hamilton testified that he was not present when the Authorizing Judge swore in Ms. Song and Agent Booker and did not know how the February 7, 2008 application and order were taken to the clerk's office. Id. at 77-78, 82. Mr. Hamilton testified that generally the Authorizing Judge would sign one packet (set) and he would stamp her signature on the additional sets. Id. at 79.

The Authorizing Judge testified on April 3, 2012. The essence of her testimony, summarized in her own words, is as follow:

> I have no recollection of February 7th, 2008, specifically, but I do have a recollection of events that occurred on some date with respect to the application, affidavit, orders at issue here. . . .
> . . . Agent Booker along with Miss Song from the U.S. Attorney's office appeared at some point before me with application, affidavit, and orders which I previously received and reviewed. And what I remember, having reviewed the affidavit now, is remarking to Agent Booker about the homicides that had occurred, specifically the one that was on the intercept at such an early point in the wiretap.
>
>     . . . .
>
> If you're going to ask me did that occur on February 7th, 2008, I can't tell you that. I can tell you it did occur on a day that I reviewed those documents and, as far as I can tell you, signed them. Obviously I don't know what happened, but I can tell you that's my recollection of having reviewed those documents, having Agent Booker and Miss Song in my office, and talking with them about this particular homicide that had occurred on the intercept, and my concern about the violence that seemed to be quite extensive.

ECF No. 836 at 6-7.

15

The Authorizing Judge, in describing her practice regarding the review and execution of the wiretap application, stated:

> After asking Miss Song if the information contained in the application was true and correct to the best of her knowledge, information and belief, and receiving an affirmative answer from her, I would then execute the document. The same practice would adhere to the affidavit, and then the orders would be signed in the presence of Special Agent Booker and Assistant United States Attorney Song.

Id. at 9.

In light of the evidence offered, the procedure followed by the government was in "compliance with all the fundamental statutory safeguards that protect against unauthorized or unwarranted wiretap surveillance." Moore, 41 F.3d at 375. In particular, the evidence shows that both Agent Booker and Ms. Song met with the Authorizing Judge in her office for the purposes of reviewing the application and the supporting material for the February 7, 2008 wiretap application. Ms. Song testified that she had three sets of the wiretap application when she appeared before the Authorizing Judge on that occasion, that each wiretap application was supported by an affidavit and accompanied by the authorizing order and two service provider orders, and that she provided the Authorizing Judge with a copy of Agent Booker's affidavit in advance of the meeting. At the meeting, the Authorizing Judge sworn in Agent Booker and Ms. Song. Agent Booker signed the affidavit and Ms. Song signed the application in the presence of the Authorizing Judge. The Authorizing Judge signed at least one set in the presence of Agent Booker and Ms. Song, which included the February 7, 2008 order authorizing the wiretap. The original set signed by the Authorizing Judge cannot be located and the only sets available are those that were stamped with her signature. The February 7, 2008 order authorizing the wiretap interceptions bearing a stamp of the Authorizing Judge's signature was authorized by the Authorizing Judge. Under these circumstances the absence of her original signature is a mere

16

technical defect which does not warrant suppression of the wiretap evidence.  Traitz, supra; Moore, supra.

For the reasons set forth above, defendants' motions to suppress wiretap evidence are denied.  An appropriate order follows.

**<u>ORDER</u>**

AND NOW, for the reasons set forth on the record and in the foregoing opinion, the motions to suppress wiretap evidence filed by defendant Alonzo Lamar Johnson (ECF No. 597) and defendant Jerome Lamont Kelly (ECF No. 667) are DENIED.

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
U.S. District Judge

Dated:  June 21, 2012